UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
DIANA ALLEN LIFE INSURANCE           :
TRUST, On Behalf of Itself and All Others
Similarly Situated,                              :

       Plaintiff,                               :

    -against-                                  :

BP P.L.C., BP EXPLORATION (Alaska)   :
INC., and THE STANDARD OIL
COMPANY,                                         :

       Defendants.                           :

------------------------------------------------------X

06 Civ. 14209 (PAC)

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

This case stems from the shut-down of the Prudhoe Bay oil field in Alaska, the largest oil field in North America. Plaintiff, the Diana Allen Life Insurance Trust, ("Plaintiff" or "Diana Allen"), is a Unit holder of the BP Prudhoe Bay Royalty Trust (the "Trust"). As a Trust Unit Holder, Plaintiff receives quarterly royalty payments which are calculated as a percentage of Prudhoe Bay oil field's daily net production. Due to a pipeline spill which occurred in March 2006, and the subsequent shut-down of the Prudhoe Bay field in August 2006, the Plaintiff's quarterly royalty interest declined. Plaintiff brings this class-action suit alleging that the decline in royalty payments was the direct result of Defendant BP Alaska's failure to maintain the pipeline as obligated by contract and tort principles, and by the failure of the other Defendants to meet their contractual obligations to the Trust Unit Holders.

Plaintiff's claims are for breach of contract, breach of an implied covenant of good faith and fair dealing, tortious interference with property rights and prospective economic advantage, and negligent maintenance of the pipeline.

1

Defendants BP ("BP"), BP Exploration (Alaska) ("BP Alaska"), and the Standard Oil Company ("Standard Oil"), (collectively "Defendants"), now move to dismiss Plaintiff's Complaint on the grounds that: (i) Plaintiff lacks standing to bring its claims with respect to the Trust because the claims are derivative, not direct, and therefore, properly asserted only by the Trustees and not the individual Unit Holders; and (ii) although Plaintiff has standing to bring a claim under the Support Agreement, that claim is not adequately pleaded. For the reasons set forth below, Defendants' motion is granted.

## SUMMARY OF FACTS[1]

### A. The Prudhoe Bay Oil Field and Spill

The Prudhoe Bay Oil field in Alaska, the largest oil field in North America, was discovered in 1968 and has been in production since 1977. Since July 1, 2000, Defendant BP Alaska had sole responsibility for the operation of the Prudhoe Bay field. On March 2, 2006, BP Alaska discovered a large oil spill in the western portion of Prudhoe Bay. Following a mandate by the United States Department of Transportation, BP—the parent company of both BP Alaska and Standard Oil, the other two named Defendants—embarked on an investigation of the spill and inspection of the pipeline. The inspection revealed that the spill was the result of a pipeline rupture, which, in turn, was caused by severe corrosion within the pipeline itself. A subsequent investigation revealed that BP had failed for years to properly maintain the pipeline, and that miles of pipeline required repair.[2] In a letter to Congress dated June 2006, Maria Cino, then Deputy Secretary of Transportation, stated that BP's management of the pipeline "does not represent sound management practices for internal corrosion control." (Compl. ¶ 33.)

---

[1] Unless otherwise noted, the following facts are taken from the Complaint, which the Court accepts as true for the purposes of this motion.
[2] Among other things, it was revealed that BP Alaska had failed to utilize a pipeline inspection gauge (or "pig") for approximately fourteen years. (Complaint ("Compl.") ¶ 33.) The "pig" would have alerted the company to the pipeline deterioration and internal corrosion which resulted in the pipeline walls becoming "paper thin." (Compl. ¶ 28.)

2

**C. The Royalty Trust and Trust Agreements**

The BP Prudhoe Bay Royalty Trust is a Delaware business trust which receives a royalty interest in the Prudhoe Bay oil field production. It was created pursuant to the Prudhoe Bay Royalty Trust Agreement (the "Trust Agreement"), dated February 28, 1989, which names Standard Oil and BP Alaska as Grantors of the Trust, Bank of New York and F. James Hutchinson as Trustees, and the Trust Unit Holders (the "Unit Holders") as the express beneficiaries. By its terms, it is governed by Delaware law. (Trust Agreement ("Trust Agmt.") § 12.07.)[3] The Trust Agreement states that "the Trust is intended to be a passive entity limited to the receipt of revenues attributable to the Royalty Interest and the distribution of such revenues, after payment of or provision for Trust expenses and liabilities, to the Unit Holders." (Trust Agmt. § 2.02.) It further provides that subject to certain enumerated limitations,

> the <u>Trustee</u> is authorized to and shall take such actions as in its judgment are necessary, desirable, or advisable to achieve the purposes of the Trust, including . . . <u>the taking of appropriate action to enforce the terms of the Conveyances and the Support Agreement (including the institution of any actions or proceedings at law or in equity necessary to the foregoing)</u> . . . ."

(Trust Agmt. § 6.01 (emphasis added).) Each Trust Unit represents an equal share of the Trust interest.

To effectuate the purpose of the Trust, and create the mechanism by which the Unit Holders received royalties, the parties entered two other agreements: the Overriding Royalty Conveyance and the Trust Conveyance. The Overriding Royalty Conveyance transferred the royalty interest in the output of Prudhoe Bay from BP Alaska to Standard Oil. Standard Oil then transferred that same royalty interest to the Trust via the Trust Conveyance.

---

[3] The Trust Agreement states, "the laws of Delaware shall control with respect to the construction, administration and validity of the Trust. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware without regard to conflicts of law rules." (Trust Agmt. § 12.07.)

3

The Overriding Royalty Conveyance describes the method for computing the royalty payments to be received by the Trust,[4] and required BP Alaska to "conduct and carry on the development, exploration, production, maintenance and operation of the [Prudhoe Bay oil field] with reasonable and prudent business judgment . . . and good oil and gas field practices, as a reasonable and prudent operator . . . ." (Overriding Royalty Conveyance ("ORC") § 7.1.)[5] BP Alaska also promised to perform "all material obligations" under the contract using "its best efforts." (ORC at § 7.2.)

Standard Oil and BP Alaska also executed the Trust Conveyance, which created the mechanism by which Trust Unit Holders would receive their royalties. By its terms, the "Trust receives all rights and benefits" from the Overriding Royalty Conveyance, and the sole property of the Trust is the Prudhoe Bay royalty interest. (Compl. ¶ 13.)

**D. The Support Agreement**

On the same day that the Trust Agreement, the Overriding Royalty Conveyance, and the Trust Conveyance were executed—February 28, 1989—the Defendants and the Trust also signed the Support Agreement which provided that in the event that BP Alaska or Standard Oil could not satisfy their financial obligations under the Trust, then BP—the parent company—would provide financial support to those subsidiaries so that they could meet their payment obligations.[6]

---

[4] It calls for royalty payments in the amount of 16.4246% of the first 90,000 barrels of the average actual daily net production of oil per quarter. (Compl. ¶ 12.)
[5] The crux of Plaintiff's claim is that Defendants' breach of the "prudent operator" obligation caused the Prudhoe Bay oil field production to fall, thus causing the Royalty Interest to decline.
[6] The Support Agreement states in relevant part:
> In order to induce the initial purchasers of Trust Units to purchase such Trust Units and in order to induce The Bank of New York and F. James Hutchinson to act as trustees under the Royalty Trust Agreement, BP shall provide financial support to the Company . . . in meeting their respective payment obligations under the . . . Royalty Trust Agreement and the Conveyance to the Trust.

(Support Agreement ("Supt. Agmt.") "Whereas" provision, ¶ 3.) In addition, a provision of the Trust Agreement required BP Alaska and Standard Oil to notify BP "as soon as practicable" in the event they had trouble meeting their financial obligations. (Trust Agmt. Art XI.) In turn, the Support Agreement provided that once notified of such trouble, BP would make funds available to the subordinate entities within 30 days of notice. (Supt. Agmt. § 2(a).)

4

The Support Agreement provides that, "[n]otwithstanding any other provision of this Agreement or the Royalty Trust Agreement, <u>the holder of any Trust Units shall have the right to initiate suit against BP</u> for the enforcement of BP's obligation . . . to cause the Company to perform its payment obligations."[7] (Supt. Agmt. § 2(a).) As evidenced by the language quoted above, the Trust Unit Holder's right to initiate suit is explicitly limited to suits against BP, and does not extend to claims against BP Alaska or Standard Oil.

**E. Procedural History**

This action was filed on December 6, 2006. The Complaint alleges:

(1) that BP Alaska and Standard Oil breached the Trust Agreement, and the implied covenant of good faith and fair dealing in that agreement, by failing to "reasonably and prudently" maintain the Prudhoe Bay oil field in accordance with "good oil and gas field practices" as required by the agreement (Counts I and II) (Compl. ¶¶ 45-57);

(2) that BP tortiously interfered with plaintiff's property rights and its prospective economic advantage, by knowingly or recklessly disregarding warnings of corrosion and maintenance failures at the pipeline (Counts III and IV) (Compl. ¶¶ 58-68);

(3) that BP, BP Alaska, and Standard Oil breached the Support Agreement, and the implied covenant of good faith and fair dealing in that agreement, by failing to comply with the notice and support provisions of that agreement which (according to Plaintiff) calls for BP to make royalty payments to the trust "in amounts reflective of pre-shutdown production levels" (Compl. ¶ 73) (Counts V and VI) (Compl. ¶¶ 69-81); and,

(4) that BP, BP Alaska, and Standard Oil were negligent in maintaining the pipeline (Count VII) (Compl. ¶¶ 82-85).

On April 23, 2007, Defendants moved to dismiss Plaintiff's claims for: (1) lack of standing to bring all but one claim (breach of the Support Agreement), and (2) inadequate pleading on all other claims. Oral argument was held on January 23, 2008.

---

[7] Defendants concede that Plaintiff has a contractual basis for standing under the Support Agreement against BP, and any claims made against BP thereunder are not subject to the derivative/direct claims analysis.

5

# DISCUSSION

## I. Pleading Requirements and the Twombly Standard

On a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, --- U.S.---, 127 S.Ct. 1955, 1975 (2007) (citation omitted). But mere "formulaic recitation of the elements of a cause of action" will not suffice; instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965. To survive a motion to dismiss, courts require "enough facts to state a claim to relief that is plausible on its face." Id. at 1974; see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."). Plaintiff must therefore allege "plausible grounds to infer" that its claims rise "above the speculative level." Twombly, 127 S.Ct. at 1965. Furthermore, when deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)). In ruling on this motion, the Court considers the Trust Agreement, the Overriding Royalty Conveyance, the Trust Conveyance, and the Support Agreement; all are incorporated into the Plaintiff's Complaint by reference and have clearly been relied on by the Plaintiff in bringing this action.

## II. Derivative v. Direct Claims

Defendants' chief argument is that Plaintiff lacks standing to bring its claims, with the exception of the one allegation that BP breached the Support Agreement (which Defendants

claim is inadequately pleaded). Defendants argue that a trust's "unit holder" is comparable to a shareholder in a class-action derivative suit. (Defendants' Memorandum in Support of their Motion to Dismiss ("Def. Mem.") at 9-14.) Just as a shareholder is first required to make a demand on a corporation's board to enforce violated rights (or to demonstrate that such demand would be futile) before he or she has standing to bring a shareholder derivative suit, so too, a trust unit holder must make a demand on the trustee before standing to sue on a violation of the trust exists. See Loveman v. Lauder, 484 F. Supp. 2d 259, 264 (S.D.N.Y. 2007).[8] The parties agree that the Trust is a Delaware entity and the issue should be resolved as a matter of Delaware law.

Delaware defined how to determine whether a claim is derivative or direct in Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035 (Del. 2004). The Delaware Supreme Court held that the issue of whether a claim is derivative or direct "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Id. at 1033. A claim is direct when the injury suffered is the claimant's alone, "independent of any alleged injury to the corporation," but it is derivative when the plaintiff cannot prevail without showing an injury to the corporation. Id. at 1039. Under the second prong of Tooley, if any benefit recovered from a lawsuit flows back to the corporation and not to the individual shareholders, then the suit is derivative in nature.

---

[8] It is too well settled to require citation of authority that the management of corporations is entrusted to their boards of directors and that it ordinarily is up to the board to determine whether to cause a corporation to pursue a claim . . . . In consequence, shareholders typically are foreclosed from suing on behalf of a corporation on a claim that the corporation itself has not brought. The exception is that a shareholder may sue derivatively on behalf of a company if the shareholder (1) makes a demand that the board cause the company to pursue the claim and sufficiently alleges that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or (2) sufficiently alleges that a demand would be a futile gesture and is therefore excused.

Loveman, 484 F. Supp. 2d at 264-65 (citations and quotation marks omitted).

7

The Tooley standard was applied by a court in this district in Debussy LLC v. Deutsche Bank AG, No. 05 Civ. 5550 (SHS), 2006 WL 800956, at *1 (S.D.N.Y. Mar. 29, 2006). The plaintiff alleged that defendants had mismanaged a business trust by dissolving it prematurely, thereby dissipating the trust's assets, and leaving the plaintiff empty-handed at the trust's end. As a result of the alleged mismanagement, and the defendants' failure to "use such care and skill as a prudent man would exercise or use under the circumstances," Id. at *2 (quoting the Debussy plaintiff's complaint), the plaintiff argued that it had standing to bring the claims directly. Judge Stein rejected that argument. He found that because "[t]he alleged harm here is that [the Defendant's] liquidation of the Trust caused the Trust to lose value; the shareholders thus lost the value of their investment through loss of value of their shares," Id. at *4, and this injury "flow[ed] to the shareholders only indirectly." Id. at *3. With respect to the second prong of Tooley, the court found that "the recovery belongs to the corporation," and not to the individual. The court held that the claims were derivative in nature and not direct, and therefore belonged to the Trust, and not the individual trust beneficiaries. Id. at *4. The court concluded that "the plaintiff lack[ed] standing to bring [the] suit directly." Id.

Plaintiff attempts to distinguish Tooley and Debussy on the basis that a royalty trust is different from a business trust and/or a corporation because it "does not generate operating revenue as a functioning independent business, does not manage assets, has no 'management' directing the business and has no purpose other than collection and distribution of the Royalty Interest." (Plaintiff's Memorandum in Opposition ("Pl. Mem.") at 8.) Since the Royalty Trust is simply a conduit for collecting and distributing money to the Unit Holders, and not an independently functioning entity in its own right, it is not a corporation or a business trust. Delaware law does not make this distinction and the contractual language does not support this

8

argument.[9] Nor does Plaintiff cite to any case involving a royalty trust to support its position. Instead, Plaintiff relies on the general bromides that "equity regards substance rather than form" (citing In re Cencom, No. C.A. 14364 (MTS), 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000)), and cites to a case involving limited partnerships. (Pl. Mem. at 14-15 (citing Anglo Am. Sec. Fund L.P. v. S.R. Global Int'l Fund, L.P., 829 A.2d 143, 151 (Del. Ch. 2000)).) That case law is inapposite where, as here, there are decisions directly addressing the issue before the Court in the trust context.

A case almost identical to this case, Goldman v. BP P.L.C., BP Exploration (Alaska), Inc., the Standard Oil Company, No. 06 Civ. 260 (JWS) (D. Alaska Sept. 18, 2007), is dispositive of Plaintiff's claim. Michael Goldman is a Trust Unit Holder of the Prudhoe Bay Royalty Trust. Goldman brought a class-action suit against the identical Defendants, on virtually identical claims, based on the identical contracts that are before the Court in this matter. With respect to the question of derivative versus direct claims, Judge John Sedwick of the District of Alaska held that "[b]ecause the claims in this action are derivative and belong to the Trust rather than to the Unit Holders, plaintiff lacks standing to bring this suit directly." Id. at 12.

In light of Debussy and Goldman, this Court now finds that the causes of action arising from purported breaches of the Trust Agreement belong to the Trustee, and not to the Plaintiff. Any loss in royalty interest as a result of the oil field shut-down flowed directly to the Trust, and only indirectly to the Unit Holders. Moreover, any recovery would be returned to the Trust, not to each individual plaintiff. The factual parallels to shareholder derivative suits are obvious (a large number of plaintiffs similarly suffering a reduction in the value of their overall investment), and the reasons for requiring demands to be made are also relevant (the Trustees are the

---

[9] Article I of the Trust Agreement (the "definitions" section) defines this "Trust" as a "business trust under the Delaware Trust Act created by and administered under the terms of this agreement." (Trust Agmt. § 1.30 (emphasis added).)

9

fiduciaries of the Unit Holders and are better suited to enforce the interests of the entire class compared to any single Unit Holder). In addition, the Trust Agreement explicitly authorizes the Trustee, and not individual Unit Holders, to institute legal action to enforce the terms of the Trust Agreement. It states that "the Trustee is authorized to and shall take such actions as in its judgment are necessary, desirable, or advisable to achieve the purposes of the Trust, including . . . the institution of any actions or proceedings at law or in equity necessary to the foregoing." (Trust Agmt. § 6.01 (emphasis added).) The Court finds that the Plaintiff lacks standing to assert claims regarding breach of the Trust Agreement. Under Tooley, Debussy, and Goldman, those claims are properly asserted by the Trustees, and not the individual Unit Holders.

### III. The Support Agreement

Plaintiff also claims that Defendants breached the Support Agreement. Here, it is undisputed that the Plaintiff has standing to bring these claims against BP under the explicit language of the Support Agreement. (Supt. Agmt., Annex I, May 8, 1989, § II.6 ("Notwithstanding any other provision of this Agreement or the Royalty Trust Agreement, the holder of any Trust Units shall have the right, which is unconditional, to institute suit against BP for the enforcement of BP's obligation under Section 2 of this Agreement to cause the Company to perform its payment obligations.").) No such language permits suit against BP Alaska or Standard Oil.

According to Plaintiff, however, BP Alaska and Standard Oil breached the Support Agreement because they did not ask for the financial assistance they were entitled to from BP under the agreement, nor did BP provide such assistance, when the royalty interest payments declined as a result of the oil field shut-down. Plaintiff contends that this situation—the declining royalty payments—amounted to a situation where BP Alaska and Standard Oil were

10

unable to meet their financial obligations under the agreement, thus triggering the clause guaranteeing BP's financial assistance.

Plaintiff, however, does not have standing to bring claims for breach of the Support Agreement against BP Alaska or Standard Oil. Neither is specifically named under the Annex to the Support Agreement which permits individual Unit Holders to bring suit against BP; therefore, claims against those two entities are derivative in nature and must be asserted by the Trustees.

With respect to the claims against BP, Plaintiff misconstrues the purpose and intent of the Support Agreement. The Support Agreement does not promise a guaranteed rate of return for Unit Holders, rather, it guarantees that royalty payments calculated using the method articulated in the contract will be paid—either by BP Alaska and Standard Oil, or by BP. The Support Agreement promises only that BP will "(i) cause [BP Alaska] to perform its payment obligations under the Royalty Interests pursuant to the Conveyance and (ii) cause [BP Alaska] and [Standard Oil] to satisfy their respective payment obligations to the Trustee . . . and their respective payment obligation to the Trust under the Royalty Trust Agreement." (Supt. Agmt.§ 2(a).) The Support Agreement contemplates that BP is to provide financial assistance when, and if, the subsidiaries could not pay the royalty amounts as calculated by the formula in the agreement. The Support Agreement does not mandate BP to supplement royalty reductions due to changes in production such that Unit Holders are guaranteed a certain rate of return. The Support Agreement assures against defaults by BP's subsidiaries and affiliates; it does not guarantee a bottom line.

During the oil field shut-down, the daily production of oil decreased, and since 'daily production' is one variable used to calculate the total royalty payments owed to the Trust under the contracts, royalty payments declined with daily production. At all times, however, the

subsidiaries paid the accurately calculated (albeit reduced) royalty payments in full. Under such circumstances, the subsidiaries were not required to notify BP of an "inability" to meet their financial obligations, and BP had no obligation to provide additional funding to the subsidiaries in order to prevent the royalty payments from declining. The royalty payments were appropriately calculated and paid according to the contract: there simply was no breach.[10] Judge Sedwick's held in Goldman:

> Plaintiff's complaint does not allege that [BP Alaska] and Standard Oil failed to satisfy their payment obligations . . . as determined by the formula in the Overriding Royalty Conveyance or that BP breached its duty to contribute the funds necessary for [BP Alaska] and Standard Oil to satisfy their payment obligations. Rather, plaintiff suggests that BP should have paid more than required under the applicable formula in order to make up for the loss of funds due to the pipeline shutdown. The plain language of the Support Agreement does not provide for such relief.

Goldman, at 11. The Court concurs with Judge Sedwick's analysis of the Support Agreement's requirements and concludes, as he did, that BP did not breach the agreement.

**IV. Request to Amend the Complaint**

Finally, Plaintiff seeks leave to amend the Complaint. (Pl. Mem. at 25 n. 24.) Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), but a district court has broad discretion in deciding whether or not to grant such a request, Fei v. WestLB Ag, No. 07 Civ. 8785 (HB), 2008 WL 594768, at *1 (S.D.N.Y. Mar. 5, 2008). For example, a district court need not allow amendment when it would be futile, or when a litigant has had previous opportunities to cure deficiencies. See Foman v. Davis, 371 U.S. 178, 182 (1962).[11]

---

[10] Moreover, "a duty of good faith and fair dealing is implicit in every contract, but [a] breach of that duty is merely a breach of the underlying contract." Geler v. Nat'l Westminster Bank, USA, 770 F.Supp. 210, 215 (S.D.N.Y. 1991). Here, because there was no breach of either the contract or the implied duties, these claims are dismissed. (Plaintiff argues that the implied duties of good faith and fair dealing spring from circumstances outside of the contract—failure to properly maintain the oil field—but these are just the contract claims recast in a different light).
[11] In Foman v. Davis, the Supreme Court stated that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

With respect to leave to re-plead, the Court gave Plaintiff the opportunity to re-plead, if it chose to do so, in light of the Defendants' observations at the pre-motion conference of March 27, 2007.[12] Plaintiff chose not to do so. In light of the clear holdings in Debussy and Goldman, and the fact that the Trustees are now in negotiations to resolve this matter,[13] the Court concludes that amendment would be futile and, in any event, the interests of justice would not be served. Plaintiff cannot cure its standing problem by re-pleading the facts of the Trust Agreement, nor can Plaintiff save its claims regarding breach of the Support Agreement through amendment; those claims fail as a matter of law. Plaintiff could amend in perpetuity and never cure the fatal deficiencies in its Complaint. Accordingly, the Court denies Plaintiff's request to amend.

## CONCLUSION

The Court finds that the Plaintiff lacks standing to assert the claims in Count I (breach of the Trust Agreement against BP Alaska and Standard Oil), Count II (breach of the implied covenant of good faith and fair dealing in the Trust Agreement against BP Alaska and Standard Oil), Count III (tortious interference with property rights under the Trust Agreement/trespass Against BP), and Count IV (tortious interference with prospective economic advantage against BP). These claims arise from obligations under the Trust Agreement and they are derivative claims which are properly asserted only by the Trustees and are dismissed. In addition, to the extent that the claims arise from duties owed under the Trust Agreement with regard to the maintenance of the pipeline, any duties allegedly breached under such agreement are owed to the Trust, and not the individual Unit Holders. Accordingly, they are dismissed.

---

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" Id.

[12] At the pre-motion conference, the Defendants set forth their basis for this motion. In light of that disclosure, the parties agreed to extend the briefing schedule in order to accommodate amendments to the pleadings before this motion arrived before the Court. (Transcript of Pre-Motion Conference, March 27, 2007, at 3.)

[13] Transcript of Oral Argument, Jan. 23, 2008, at 3 (Defense counsel stating that BP Alaska "is currently in discussion with counsel for the [Trustee] Bank of New York to resolve the trust's claims against [BP Alaska] arising out of the maintenance of the Prudhoe Bay pipelines.").

With respect to Counts V and VI (breach of the Support Agreement and its implied covenant of good faith and fair dealing against all Defendants), Plaintiff lacks standing to bring the claims with respect to BP Alaska and Standard Oil, and these claims are dismissed. The Support Agreement provides that individual Unit Holders have standing to enforce the Agreement against BP only. The royalties actually paid were calculated and disbursed in full compliance with the contractually stipulated formulas. The Support Agreement was not breached and the claims against BP are dismissed for failure to state a claim.

With respect to Count VII (negligence against all Defendants in the maintenance and care of the pipeline), the Court finds that to the extent such duties of care were owed by Defendants, they were owed to the Trust and not to the individual Unit Holders. Any action based on the negligent performance of those duties, therefore, is properly asserted only by the Trustees.

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to enter judgment and terminate this action.

Dated: New York, New York
      March 31, 2008

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

With respect to Counts V and VI (breach of the Support Agreement and its implied covenant of good faith and fair dealing against all Defendants), Plaintiff lacks standing to bring the claims with respect to BP Alaska and Standard Oil, and these claims are dismissed. The Support Agreement provides that individual Unit Holders have standing to enforce the Agreement against BP only. The royalties actually paid were calculated and disbursed in full compliance with the contractually stipulated formulas. The Support Agreement was not breached and the claims against BP are dismissed for failure to state a claim.

With respect to Count VII (negligence against all Defendants in the maintenance and care of the pipeline), the Court finds that to the extent such duties of care were owed by Defendants, they were owed to the Trust and not to the individual Unit Holders. Any action based on the negligent performance of those duties, therefore, is properly asserted only by the Trustees.

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to enter judgment and terminate this action.

Dated: New York, New York
March 31, 2008

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge